IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

_____

| | |
|---|---|
| STEVEN PATRICK HAFFEY, | Cause No. CV 12-100-M-DLC-JCL |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| LEROY KIRKEGARD, Warden, Montana State Prison; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondent. | |

_____

On June 12, 2012, Petitioner Steven Haffey filed this action seeking a writ of habeas corpus under 28 U.S.C. § 2254. Haffey is a state prisoner proceeding pro se.

A stay was imposed pending conclusion of Haffey's postconviction proceedings. It was lifted on December 7, 2012. On December 27, 2012, Respondent ("the State") filed various documents from the state court record. The pleadings before the Court consist of Haffey's petition (doc. 1) and a supplement filed on January 8, 2013 (doc. 14-1).

1

# I. Preliminary Screening

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts requires courts to examine the petition before ordering the respondent to file an answer or any other pleading. The petition must be summarily dismissed "[i]f it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." *Id.*

A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court,* 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolaus*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). Consideration under Rule 4 "may properly encompass any exhibits attached to the petition, including, but not limited to, transcripts, sentencing records, and copies of state court opinions. The judge may order any of these items for his consideration if they are not yet included with the petition." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases. "[I]t is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." *Id.*; *see also* 28 U.S.C. § 2243.

# II. Background

On June 14, 2007, a Missoula County jury convicted Haffey of felony assault

with a weapon and driving under the influence of alcohol ("DUI"). For these offenses, he is currently serving a sentence of fifty years, with twenty suspended, for the assault and as a persistent felony offender, and six months for the DUI. Based in part on these convictions, Haffey's suspended sentences on prior convictions were also revoked, and he is serving partially concurrent and partially consecutive revocation sentences. *See* Judgment (doc. 13-8) at 3; Sentencing Tr. (doc. 13-6) at 844:18-845:14.

The incident that led to Haffey's latest conviction occurred in the early morning hours of February 27, 2007. A group of four friends, including Christopher Nyomo, was heading back home after an evening of socializing and drinking at various bars around town. They had picked up slices of pizza and were crossing the street at the intersection of Spruce and Ryman in downtown Missoula. A red, older-model Honda Civic hatchback sped up to them and went on through the crosswalk, nearly hitting them. They shouted at the driver, who skidded to a stop, reversed, turned around, and came back at them. Everyone but Nyomo got out of the way. Nyomo was carried on the hood of the vehicle to the next intersection, Spruce and Woody, and was flung off when the car turned south. He landed on the pavement and was unconscious when his friends caught up with him. Nyomo's blood-alcohol concentration was 0.271. As he regained consciousness, he was so combative with

emergency services personnel that he had to be handcuffed to keep him from moving too much or hurting someone else. His injuries were relatively minor, however, and he was treated and released from the emergency room.

The City of Missoula Police Department is located on Spruce Street, between Ryman and Woody Streets. Along with two other witnesses who were not connected with Nyomo's group, a civilian police department employee saw the incident. He ran to the police department parking lot, where Officer Manraksa and a trainee officer were just pulling in. As the civilian described the incident to the officer, he sighted and pointed at the Honda heading south on Woody. Manraksa returned to his cruiser, broadcast the report on his radio, and started after the red hatchback, but he lost sight of it in the meantime.

Officer Tucker happened to be driving east on Broadway when he saw a red Honda Civic hatchback run the stop sign at Woody and turn west onto Broadway. As Tucker turned his cruiser around to stop the car for running the stop sign, Manraksa's report of a hit and run near the police station involving a small red hatchback was broadcast over the radio. The Honda had pulled into the left turn lane at Orange and Broadway. Tucker pulled it over in a parking lot on the other side of the intersection. Haffey was in the driver's seat. The Honda had a partially shattered windshield, with some shards of glass still clinging to the hood and some falling inward to the

dashboard and interior floor of the vehicle. The steering wheel, Haffey's jacket, and an envelope found on the floor of the passenger compartment had traces of blood on them. Two glass tumblers were also found in the car. On the hood and passenger-side door were a few smears of a red liquid substance and small bits of a "fleshy-type substance" – but these turned out to be pizza sauce and bits of crust. Tucker, after administering DUI field tests, arrested Haffey. Haffey's blood-alcohol concentration was 0.11.

Shortly after his arrest, Haffey spoke with his father by telephone from the jail. In this recorded conversation, Haffey said he was going to be charged with deliberate homicide because he had killed a man in a traffic accident. (That was not true, but someone told Haffey Nyomo was dead.) Haffey said to his father, "[T]his guy came runnin' out in to the street and I couldn't stop in time and I hit him."

Nyomo did not remember much of the incident itself, but his friends, the two other bystanders, and the civilian police employee testified to seeing the Honda skid to a stop, turn around, and take what appeared to be deliberate aim at the pedestrians still in the crosswalk, including Nyomo. The State introduced expert testimony establishing that tire marks found on the pavement were consistent with witnesses' account of the stop and turnaround. Some of the witnesses could not see into the vehicle at all, and some said they could see one person inside, but no one saw the

driver well enough to give any description.

Trial counsel Chris Daly mounted a reasonable-doubt defense, questioning the integrity and thoroughness of the investigation, raising the possibility that someone else was driving but fled the vehicle immediately after the impact with Nyomo, and suggesting that Nyomo, heavily intoxicated and aggressive, leaped on to the hood of the vehicle as it came back through the crosswalk. But the jury believed that Haffey purposely or knowingly caused bodily injury to Nyomo by using his car as a weapon.

About a month after trial, Haffey wrote a letter to the trial court, complaining of trial counsel's performance. A hearing was held. Among other things, Haffey asserted that counsel Chris Daly should have obtained testing of two beer glasses and the blood-spattered envelope found on the passenger side of the interior compartment. Haffey said the blood was his, not Nyomo's, and fingerprints on the glasses would show another person was in the vehicle. Hr'g Tr. (doc. 13-6) at 744:8-745:10. The trial court asked why it would matter whether someone else was in the car. Haffey responded:

> Haffey:    I wasn't driving the vehicle, Your Honor. I – I was in the vehicle, and we parked right outside this courthouse,[1] right here, on the night that it happened, and he jumped out of the vehicle, and took off. . . .

---

[1] The Missoula County Courthouse is one block south of the police station, bordered by Pine, Ryman, Broadway, and Woody.

| | |
|---|---|
| The Court: | Who was driving? |
| Haffey: | Your Honor, if you would ensure me that my parents are going to be okay, and safe, and they're going to be watched, I will tell you. |
| The Court: | Mr. Haffey, if you're trying to make an allegation before this Court that someone [else] was driving, you better tell the Court who was driving. |
| Haffey: | His name is Jim Todd, Your Honor. |
| . . . | |
| The Court: | So, the phone conversation from you to your father was all a lie, on your part? |
| Haffey: | Well, Your Honor, I – at that time – |
| The Court: | No, I'm asking you a question.  Was it all a lie on your part? |
| Haffey: | Well, I guess, it was, Your Honor. |
| The Court: | Well, why would you tell your father that you killed someone? |
| Haffey: | Because that's what they told me. |
| The Court: | No, I'm asking you why you told your father you killed someone, that you were drunk, and just lost it? |
| Haffey: | I said, I thought I killed somebody, that I was told that I'd killed somebody. |
| The Court: | You told your father, you killed someone, and the State was going to ask for the death penalty. |

| Haffey: | Yes, sir, I thought they would, and I was scared at that moment, and then – |
|---|---|
| The Court: | And, never a mention of anybody else in your vehicle. |
| Haffey: | I thought the evidence showed that, Your Honor. |
| The Court: | And, never a mention to your father of anyone else in the vehicle? |
| Haffey: | No, I did not. |
| The Court: | Okay. And, never a mention to your father that the State made a mistake? |
| Haffey: | That the State made a mistake? |
| The Court: | That's right. That you were an innocent man? |
| Haffey: | No, I wanted to plead guilty, because I had a revocation that I was looking for. I figured the State was going to sentence me to prison anyway. |

Hr'g Tr. (doc. 13-6) at 745:14-746:14, 748:9-750:4.

In response to Haffey's complaints about his performance, Daly explained that Haffey "never told me anything about anybody being in the vehicle with him," "never told me anything about Mr. Todd, or that there was any other driver in the car. He, always, maintained that he didn't remember." *Id.* at 756:3-758:5; *see also id.* at 764:21-765:16. Daly also explained why he was not sure what the rebuttal witnesses he had retained would say and why he handled the case the way he did. The trial

court found Haffey's statements "carry no merit, nor any credibility with this Court" and rejected Haffey's claims. *Id.* at 799:8-800:11.

Haffey appealed issues concerning counsel's performance at trial. On December 16, 2008, the Montana Supreme Court affirmed his conviction. *State v. Haffey*, No. DA 07-0605 (Mont. Dec. 16, 2008).

Haffey later filed a petition for DNA testing and a petition for postconviction relief in the trial court. Both petitions were denied. Haffey appealed both, and the Montana Supreme Court affirmed the trial court. *Haffey v. State*, 233 P.3d 315, 320 ¶ 24 (Mont. 2010); *Haffey v. State*, No. DA 12-0084 (Mont. Sept. 4, 2012).

Haffey filed his federal petition on June 12, 2012. The federal petition was stayed pending completion of the postconviction appeal.

### III. Haffey's Claims and Analysis

#### A. DNA Testing and Discovery

In Grounds One, Four, and Seven of his petition, Haffey asserts that the state courts' procedures for hearing claims for DNA testing are faulty and the access to legal resources provided to him as a prisoner is too limited. He claims that he used the form provided for a petition for DNA testing yet saw his petition dismissed as defective. He also contends that the state courts should have granted his petition for DNA testing and his request for production of all the evidence gathered in the course

of the police investigation and of trial counsel's file.  Pet. at 5-7, 11-12, 15-16.

Haffey's petition for DNA testing was not denied because he was self-represented and did not know how to present it.  It was denied because, even if the testing he requested was performed and yielded precisely the result he predicted, that result would not weigh significantly against his conviction.  All claims relating to the adequacy of the prison's legal resources or his access to them, Pet. at 5-7, 11-12, 15-16, should be denied.

Haffey disagrees with the Montana courts' denials of his motions for DNA testing and for production of all the evidence gathered in the course of the police investigation.  It is doubtful that a federal habeas court could grant relief on such a claim, because it is directed principally at state courts' decisions under state laws, *see Wilson v. Corcoran*, __ U.S. __, 131 S. Ct. 13, 16 (2010) (per curiam), and because the nexus between Haffey's petition for DNA testing and his custody is attenuated, *see, e.g.*, *Bailey v. Hill*, 599 F.3d 976, 980 (9th Cir. 2010).  At any rate, the state's statute appears to provide an adequate procedure for relief.  It requires the person seeking DNA testing to show the test "would establish, in light of all the evidence, whether the petitioner was the perpetrator of the felony that resulted in the conviction." Mont. Code Ann. § 46-21-110(5)(e).  This materiality requirement is familiar and constitutionally unobjectionable.  *See, e.g.*, 18 U.S.C. § 3600(a)(1),

10

(6)(B), (8); *District Att'y's Office v. Osborne*, 557 U.S. 52, 69-71 (2009) (approving requirement that proposed test be "sufficiently material" to guilt or innocence).

Even assuming 28 U.S.C. § 2254(a) allows a federal habeas court to hear the claim on the merits, Haffey's proposed test plainly would not help to "establish, in light of all the evidence," whether he "was the perpetrator of the felony that resulted in the conviction." Whether Nyomo jumped on the vehicle or was hit, he might have hit his head on the windshield and bled, and a few drops of blood might have landed inside the car. Whether Haffey was driving or riding along, he might have cut his hands on the shattered windshield glass and a few drops of blood might have landed inside the car. Proof that the blood was Nyomo's would not make it more likely or less likely that Nyomo was hit instead of jumping on the vehicle. Conclusive and incontrovertible proof that the blood on the envelope was Haffey's would not make it more likely or less likely that Haffey's hands were on the steering wheel when Nyomo hit the windshield. It simply does not make any difference whether, as Haffey insists, the blood is his.

Assuming Haffey properly requested fingerprint testing of the two glass tumblers found in the Honda, Pet. at 12, the same shortcoming arises. Even if someone else's prints were found on the tumblers, that fact would have minimal probative value on the question of whether someone else was even present in the

vehicle, much less driving it, when Nyomo hit the windshield.

Finally, Haffey finds fault in the Montana Supreme Court's opinion because it stated he did not present an "other driver" theory until after trial. *E.g.*, *Haffey*, 233 P.3d at 316-17 ¶ 5. The defense did suggest to the jury that someone else could have fled the scene after Nyomo was hit. But the Montana Supreme Court's opinion was not wrong, because suggesting there *could have* been another driver involves a different way of presenting and preparing a case than does a claim that there *was* another driver. "In any event," as the Montana Supreme Court said, Haffey's claim that DNA testing would show he was merely a passenger when Nyomo was hit is not true. *Id.* at 317 ¶ 6, 320 ¶ 22.

Haffey provided no plausible basis for further investigation of the crime. No defect in the statute or in the resources or means of filing available to Haffey in prison was responsible for the denial of his requests for further investigation. His requests were meritless. All claims related to Haffey's alleged innocence and alleged inability to establish it, Pet. at 5-7, 11-12, 15-16, should be denied.

## B. Claims Alleging Ineffective Assistance of Counsel

Claims of ineffective assistance of trial counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Haffey must show both that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and

12

that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689.

Haffey was arraigned on March 26, 2007. Hr'g Tr. (doc. 13-5) at 4:5. On or before April 11, 2007, Haffey and Daly had submitted a proposed plea agreement to the State. *Id.* at 11:17-18, 13:20-22, 14:13-19. Haffey offered to plead guilty in exchange for an agreement or recommendation of twenty years total on both the new offenses and the revocations, with all sentences to run concurrently. In mid-May of 2007, the State rejected the offer. At that point, Haffey told counsel he wanted to go to trial. *Id.* at 16:11-17; Hr'g Tr. (doc. 13-6) at 758:21-759:19. Trial was set for Tuesday, June 11, 2007. Trial Tr. (doc. 13-5) at 20:21-24.

### 1. Pre-Trial Inquiry Into Conflict With Counsel

On June 6, a pretrial conference was held. The State moved to continue because two of its witnesses would not be available, but the court denied the motion. Hr'g Tr. (doc. 13-5) at 23:6-19, 24:24-25:11, 28:20-29:7. Daly also moved for a

13

continuance so that he could "get our rebuttal witnesses lined up." He was referring to two rebuttal experts: Dr. Quick, who was one engaged to determine whether Nyomo's injuries were inconsistent with being struck by the Honda, and an accident reconstructionist, who reviewed the adequacy of the police investigation. Haffey himself, however, opposed his counsel's motion: "I've talked to Mr. Daly about postponing into next week. I'd like to go to trial. I believe we're ready for trial. . . . I don't really need those witnesses." *Id.* at 25:17-27:12. Haffey also said, "Your Honor, I feel I'm being inadequately represented at this time," *id.* at 26:24-27:1, but his last word on the issue, when the trial court reiterated that Haffey's demand for a speedy trial would be honored, was "Thank you, Your Honor." *Id.* at 29:4-8.

In his federal petition, Haffey contends that the trial court's inquiry into his complaints about Daly was inadequate and forced him to choose between effective representation and his right to a speedy trial. Pet. at 13. First, replacement of defense counsel five days before trial certainly would have made a continuance necessary, and that time certainly would have been charged, at least in large part, to Haffey. *Vermont v. Brillon*, 556 U.S. 81, __, 129 S. Ct. 1283, 1291-92 (2009). Second, Haffey shows neither that counsel was ineffective nor that there was a speedy trial violation. Even if trial had been continued, the total delay from arrest to trial would only have been from late February to roughly October. It would not, in other words,

14

approach the one-year threshold dividing ordinary delay from presumptively prejudicial delay. *Doggett v. United States*, 505 U.S. 647, 651-52 & n.1 (1992); *United States v. Ewell*, 383 U.S. 116, 120 (1966), *quoted in Barker v. Wingo*, 407 U.S. 514, 521 n.15 (1972). Further, just as a defendant who takes the stand in his own defense "cannot reasonably claim that the Fifth Amendment gives him . . . an immunity from cross-examination on the matters he has himself put in dispute," *Brown v. United States*, 356 U.S. 148, 155-56 (1958), there is no constitutional violation when a defendant finds he must choose between two things even though he wants some aspects of both.

Finally, Haffey did not say he wanted new counsel. He said, "I believe we're ready for trial." Other than his disagreement with Daly about the role of the rebuttal witnesses – a point on which Haffey prevailed – Haffey did not say Daly had failed to investigate anything, did not describe a breakdown in communications, and did not give the trial court any reason to inquire further. This claim, Pet. at 13, should be denied.

## 2. Phone Conversation

At the June 6 pretrial conference, the parties also discussed whether the tape-recorded conversation between Haffey and his father over the jail telephone was admissible. The State failed to timely notify Daly of its existence, and Daly had not

yet heard the recording. Daly opposed the State's motion to add William Haffey as a witness to testify about the conversation because much irrelevant, prejudicial, and false information about the charges was reflected in the conversation. *E.g.*, Hr'g Tr. (doc. 13-5) at 33:11-34:24.

But Daly was not opposed to the State's admitting one of Haffey's statements to his father, and it was the only one admitted at trial:

> I don't – all I know is that this guy came running out into the street, and I couldn't stop in time, and I hit him. And, then, when I pulled over, and waited for the police, they put me through a series of tests, and I was passing all their tests. And, then, finally – I mean, I was – I admitted to drinking – you know. You know, but they still wanted me to do all these stupid tests. So, I did the tests. I cooperated with them, and everything. And, then, I asked them what my charges were, because I knew I was going to get a DUI.

Trial Tr. at 605:5-20 (reading Supp. Ex. Tr. at 2 (doc. 14-2 at 8)).

As Daly explained at the post-trial hearing on Haffey's allegations of ineffective assistance, the defense was reasonable doubt. Nyomo's injuries were not what a reasonable person might expect if he had actually been struck by the Honda. Daly intended to emphasize Nyomo's combativeness when he regained consciousness and to suggest[2] that Nyomo's injuries could have been caused by being thrown off the

---

[2] Daly retained an expert witness, Dr. Quick, to support this theory, but the expert told him that Nyomo's injuries were consistent with the State's theory of the case. Hr'g Tr. (doc. 13-6) at 768:16-24.

16

vehicle when it made the turn south onto Woody Street. So, when Daly realized that the phone conversation included a statement by Haffey that Nyomo "came runnin' out into the street and I couldn't stop in time and I hit him," he recognized the statement was consistent with one of the reasons the defense claimed there was reasonable doubt: Nyomo might not have been hit at all but, in a fit of drunken bravado, leaped onto the hood of the vehicle, "like T.J. Hooker," Trial Tr. (doc. 13-6) at 701:2-702:21 (closing argument), the fabled 1980's television police officer.

That theory stood a reasonable chance of holding up to the witnesses' unanimous insistence that the Honda stopped, turned around, and drove toward the pedestrians once again, apparently deliberately targeting them. It did not ask the jurors to reject what the witnesses saw; it only asked the jurors to question the inference that the driver intended to, or should have known he could, hit one of them. Daly's decision to agree to the admission of Haffey's statement was consistent with this theory. It certainly was not deficient performance.

It is possible, as Haffey says, that Daly could have objected to the statement on Fourth Amendment grounds. The statement was made before a warning was heard about monitoring or recording of the call. But statements Haffey made after the warning would not have been inadmissible under the Fourth Amendment. *E.g.*, Supp. Ex. at 3 (doc. 14-2 at 9) ("I did not mean to hit that guy, I didn't see him, and I tried

to stop for him, but I couldn't. . . . (inaudible) hit the car and (inaudible)"). And those statements were substantially less favorable than the one admitted at trial, because they did not suggest Nyomo "[ran] out in to the street."

The real gravamen of Haffey's claim is that Daly's withdrawal of his objection to the statement eventually turned out to be inconsistent with Haffey's post-trial assertion that he was not driving. Since Haffey said he could not remember anything, Daly could not possibly have known that Haffey not only *did* remember the events in question, but knew that Mr. Todd was driving (assuming, for the sake of argument, Haffey's second story is true and his first is not). The court did not err in admitting Haffey's statement with the parties' agreement, and Haffey can show neither deficient performance by counsel, in light of what counsel knew at the time, nor resultant prejudice at trial. This claim, Supp. (doc. 14-1) at 1-2, should be denied.

### 3. Incompatible Defense Theories

Daly did not rest solely on the T.J. Hooker argument. As stated, he presented a reasonable-doubt defense. In a criminal case, any reasonable doubt will do, and no one knows which doubt will hold the most traction with a juror. Accordingly, at trial,[3] Daly also questioned the thoroughness of the accident reconstruction. He

---

[3] Daly advised Haffey to enter an open guilty plea to the DUI charge on the morning of trial to prevent the State from introducing the videotape of Haffey's field sobriety tests. Haffey did not take Daly's advice. Watching Haffey attempt to perform the tests apparently prompted some

18

raised the possibility – without taking the risk of having it disproved – that Haffey's studded tires would have left different types of marks at the scene, and he pointed out that the police did not even attempt to match up the marks at the scene with the tires on Haffey's vehicle. He established that there was no blood at all on the exterior of the car, and he raised the possibility – again, without taking the risk of having it disproved – that the blood inside the vehicle was not Nyomo's but Haffey's. He introduced a photograph showing that Haffey's hands had blood on them, presumably from being cut by windshield glass, when he was arrested. And, by demonstrating that the State had not tested the blood inside the vehicle – in fact, had not even looked everywhere inside the vehicle for traces of blood – Daly also suggested the jury could not have enough confidence in the investigation as a whole to find Haffey guilty beyond a reasonable doubt. *See, e.g.*, Trial Tr. (doc. 13-6) at 539:19-540:19, 572:23-578:6, 610:4-15, 652:10-657:3, 661:5-662:19.

Finally, and specifically at Haffey's request, Trial Tr. (doc. 13-6) at 756:3-757:24, Daly took several opportunities to suggest that the police investigation was so slipshod that it was even possible someone else could have been driving at the time of the impact with Nyomo. He called Detective Denton to show there could have been a brief time gap between the impact and the Honda's running of the stop sign.

---

snickering from the jury. Hr'g Tr. (doc. 13-6) at 794:16-795:21, 796:7-12.

*Id.* at 608:3-609:21, 611:7-9, 612:3-613:13. He called crime scene technician Barb

Fortunate to point out that no one looked for blood on the passenger seat belt, *id.* at

658:1-659:10, and to emphasize that the windshield glass and envelope with blood

spatter were found on the passenger side of the interior compartment, *id.* at 653:10-

656:24, 660:19-662:19. Haffey's notion that someone else was driving but jumped

out of the vehicle was far-fetched, but it was nonetheless consistent with a

reasonable-doubt defense. As Daly said in his closing argument:

> I'm not asking you to adopt a particular version of what could have
> happened here. What I am asking you to do is find reasonable doubt,
> that it could not have happened the way the State said it did.[4] And, if
> you have doubt in your mind about the way – a common sense doubt
> about the way it happened, then, that's reasonable doubt, ladies and
> gentlemen. . . . [T]here are other explanations for what could have
> happened.

Trial Tr. (doc. 13-6) at 705:2-11, 705:19-20. For Daly to "proceed[] any further" than

he did "with this idea that somebody else was in the car" would come too close, as he

said, to presenting mutually incompatible defenses, given Haffey's statement to his

father. Hr'g Tr. at 756:8-757:24. But this is a matter of degree. Daly understood it

and handled it skillfully.

Haffey's claims that Daly presented mutually incompatible defense theories,

---

[4] Given the context, a reasonable juror would have taken this statement not as "it couldn't have happened the way the State said it did" but as "it could have happened not in the way the State says it did."

Pet. at 8, should be denied because all of Daly's suggestions were compatible with a reasonable-doubt theory.

### 4. Remaining Claims

Haffey complains of Daly's candid admission to the trial court that the defense was "in flux," *see* Hr'g Tr. (doc. 13-6) at 762:22-23, because he was not sure whether his rebuttal witnesses would have favorable testimony. Daly was unsure because Haffey opposed Daly's motion to continue. His opposition pushed the rebuttal witnesses to deliver their assessments and pushed Daly to evaluate their utility to the defense in the space of a few days, at the same time Daly was preparing for trial. Still, Daly timely obtained their opinions and preserved the opportunity to use them if they were favorable, though they were not. Daly's performance was fully competent. This claim, Pet. at 10, should be denied.

Haffey is correct that Daly omitted an opening statement. Daly explained that trial began when he was still waiting to know whether Dr. Quick would have favorable testimony for him. When it became clear he did not, Daly instead subpoenaed the emergency room physician who treated Nyomo and a few other witnesses. But Daly could not know whether they would appear as ordered. Rather than telling the jury which additional witnesses they would hear from and taking the risk of being wrong, Daly simply began calling witnesses. Hr'g Tr. at 759:8-19,

761:9-764:6. At any rate, the jury knew the State must prove the elements beyond a reasonable doubt, and the jury knew Daly was eliciting testimony that suggested room for doubt. *E.g.*, Trial Tr. (doc. 13-5) at 152:7-153:6, 273:15-274:15. And even if the omission of an opening statement was deficient, Haffey suffered no prejudice. This claim, Pet. at 10, should be denied.

There is no reason to think Haffey might have been acquitted if only Daly had obtained admission of three photographs of blood on his hands, rather than one, or if he would have shown photos to the jury during trial rather than having them admitted for the jury's inspection during deliberations. The only point to be made was that the blood inside the vehicle could have been Haffey's, and one photo of Haffey's hands was enough. This claim, Pet. at 9, should be denied.

### 5. Cumulative Error

Even assuming, for the sake of argument, that Daly erred in not making an opening statement, "[t]here can be no cumulative error when a defendant fails to identify more than one error." *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012). This claim, Pet. at 14, should be denied.

### C. Chief Justice McGrath

Before being elected Chief Justice of the Montana Supreme Court in November 2008 and taking office in January 2009, Mike McGrath was the Attorney General of

the State of Montana. As such, he was named as the lead attorney on every appellate brief filed by the State during his tenure. But it has long been recognized that "there is no impropriety where the judge's role as prosecutor has been largely formal, as in the case of former Attorneys General, who have only theoretical responsibility" for routine prosecutions. John P. Frank, "Disqualification of Judges," 56 Yale L.J. 605, 624 (1947), *cited in Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 877 (2009). In Montana, the county attorney, not the Attorney General, "directs under what conditions a criminal action shall be commenced," and "his supervision and control is complete, limited only by such restrictions as the law imposes." *Halladay v. State Bank of Fairfield*, 212 P. 861, 863 (Mont. 1923), *quoted in State ex rel. Fletcher v. Nineteenth Jud. Dist. Court*, 859 P.2d 992, 995 (Mont. 1993); Mont. Code Ann. § 7-4-2712, -2716(1); *see also State v. Tichenor*, 60 P.3d 454, 459 ¶ 26 (Mont. 2002); *State ex rel. Woodahl v. First Jud. Dist. Court*, 495 P.2d 182, 185 (Mont. 1972). The state court record gives not the remotest hint that there was any "probability of unfairness," *In re Murchison*, 349 U.S. 133, 136 (1955), or so strong a "risk of actual bias or prejudgment" that Chief Justice McGrath was obliged by the constitutional guarantee of due process to recuse himself, *Caperton*, 556 U.S. at 883-84 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). This claim, Pet. at 7, 17, should be denied.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

None of Haffey's claims meets the standard. Even if all the blood traces inside the Honda proved to be Haffey's blood, that fact would not be significantly probative of whether he was driving when Nyomo was injured. His state petitions were denied for lack of merit, not for any reason involving his pro se status or limited access to legal resources.

The trial court adequately addressed Haffey's pretrial complaints about counsel by holding his trial date. Counsel's agreement to admission of Haffey's statement to his father supported the reasonable-doubt defense, and the possibility that there was another person driving was also consistent with the reasonable-doubt defense.

Whatever "flux" the defense was in was Haffey's responsibility, because he insisted on holding a trial date that was five days away over his counsel's wish for additional time to secure rebuttal witnesses. Even assuming counsel's omission of an opening statement was deficient – and in the circumstances it was not, that is only one error – and Haffey can show no prejudice from it, much less cumulative prejudice from multiple errors. In fact, the transcript shows that Haffey made counsel's job very difficult. He told counsel one story before trial and, after trial, told a different one that probably would have led to development of a different defense. He resisted counsel's request for a continuance to secure rebuttal testimony. He refused counsel's advice to plead guilty to the DUI charge, which allowed the State to show the jury the damaging videotape of Haffey's inebriated efforts at passing field sobriety tests. Despite the handicaps created by Haffey's conduct, counsel performed professionally and effectively.

Finally, Chief Justice McGrath is not constitutionally required to recuse himself every time a case comes before him involving a defendant who was convicted during his tenure as Attorney General.

Haffey presents no open questions and nothing on which reasonable jurists could disagree. The law underlying denial of his claims is well-established. A COA is not warranted.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. The Petition (docs. 1, 14-1) should be DENIED on the merits.

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Haffey may serve and file written objections to this Findings and Recommendation within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing. If Haffey files objections, he must itemize each factual finding to which objection is made and must identify the evidence in the record he relies on to contradict that finding; and he must itemize each recommendation to which objection is made and must set forth the authority he relies on to contradict that recommendation. Failure to assert a relevant fact or argument in objection to this Findings and Recommendation may preclude Haffey from relying on that fact or argument at a later stage of the proceeding. A district judge will make a de novo determination of those portions of the Findings and

Recommendation to which objection is made. The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Haffey must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of his case without notice to him.

DATED this 20th day of May, 2013.

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge